McHugh, J.
This is a case in which the essential facts are undisputed, the Charter provisions are clear and unambiguous and the Board of Aldermen has decided, not unreasonably, that there is a better way to do things than the way the Charter requires. Perhaps there is. Until the Charter’s mandate is suspended or altered in a manner prescribed by law, however, the Charter governs and must be followed.
I. FACTS
Briefly stated, the facts are these.[1] Theodore Mann, who had been Mayor of the City of Newton for approximately 22 years, was reelected to a four-year term effective January 1, 1994. Mayor Mann died on April 9, 1994, with approximately 45 months remaining in his term of office. Upon his death and in accordance with the City Charter, Thomas B. Concannon, Jr., President of the Board of Aldermen was sworn in as, and assumed the office of, acting Mayor. Under Sec *152 tion 3-9 of the City Charter and G.L.c. 39, §5, Mayor Concannon, as acting Mayor, may act “only in matters not admitting of delay, and shall not make permanent appointments.”
Section 3-10 of the Charter provides in essence that when a vacancy “occurs” in the office of Mayor as a result, among other things, of the incumbent’s death under circumstances like these, the “Board of Aider-men shall forthwith call a special election to fill such vacancy for the remainder of the unexpired term.” Section 3-5 of the Charter provides that that election must “be held within 120 days following the date on which the election is called” and Section 8-3(a) of the Charter provides for a preliminary election before the final election.
The Board of Aldermen met on April 25, 1994 to consider an appropriate plan of action in light of Mayor Mann’s death and the Charter provisions just quoted. Earlier, however, various City officials had reviewed the issues and considered the consequences of the Charter’s mandate. On April 13, four days after Mayor Mann’s death, the City’s Election Commission held a public meeting and voted to ask the Board of Aldermen to seek a “Home Rule” petition to override the 120-day requirement. The Board of Aldermen took up that request on April 18 and referred the question to its standing Committee on Programs and Services. That Committee held a public hearing on April 20 and, at the meeting, voted 6-2 to request the Board of Aider-men to seek the “Home Rule" petition the Election Commission had requested.
The Election Commission and the Committee on Programs and Services took the stated positions essentially for two reasons. First, setting an election within the required 120-day period but far enough into the future to allow full participation by all interested candidates and voters would require an election in mid-August when many citizens were traditionally out of the City on vacation. Second, a special election would cost the City about $80,000.00. Both the Commission and the Committee considered expenditure of that sum unnecessary in light of the fact that the election for Mayor could be combined at virtually no additional cost with elections for statewide and other offices now scheduled for September 20 and November 8, 1994.
As stated, the Board of Aldermen considered the question at a special meting it held on April 25, 1994. After full debate the Board voted, 13-9, to file a “Home Rule” petition asking the General Court to enact legislation designed to suspend the 120-day requirement by setting the Mayoral election dates for September 20 and November 8. Plaintiffs are two Aldermen who voted against the measure.
The “Home Rule” Petition was filed and referred to the Joint House and Senate Committee on Elections. The Joint Committee held hearings on the Petition on May 2, 1994 and recommended its passage. The measure passed the House of Representatives the same day and was referred to the Senate where it is calendared for full consideration today, May 9, 1994.
Against that backdrop, Plaintiffs maintain that Board of Aldermen’s action does not amount to the “forthwith” call for an election the Charter unambiguously requires and that this court therefore should issue a writ of mandamus, on a preliminary basis, ordering the Board to call the election. For its part, the Board urges the court to stay its hand because, in its view, all relevant policy considerations favor the course the Board has taken even though a “literal reading” of the Charter would require the call plaintiffs seek. In addition, the Board, although not challenging plaintiffs’ standing, states that they cannot demonstrate the likelihood of irreparable harm necessary for issuance of a preliminary injunction and that the public interest, surely an important consideration in matters like these, would not be served by such an injunction. See generally Packaging Industries Group v. Cheney, 380 Mass. 609, 616-18 (1980); Bank of New England. N.A. v. Mortgage Corporation of New England, 30 Mass.App.Ct. 238, 246 (1991).
II. DISCUSSION
A. The Charter
Dealing first with construction of the Charter, I am of the opinion that the applicable provisions are essentially straightforward and unambiguous. When a vacancy in the office of Mayor is created under circumstances like these, the Board of Aldermen must “call” an election “forthwith” and the election must be held no later than 120 days after the call. The Board cannot effectively amend the Charter because of its own view of public policy however carefully it has formed or deeply it holds that view. The Charter is the City’s organic law and, as such, tells the Board what it may and may not do. The Charter therefore embodies the citizens’ view of sound public policy on questions of public administration, a view the Board must follow.
There is nothing, of course, that prohibits the Board from seeking to alter the Charter’s requirements through a “Home Rule” petition. The Constitution of the Commonwealth expressly permits such a course of action and thereby provides a mechanism for dealing with imbalances and inequities application of Charter provisions in particular circumstances may produce. Massachusetts Constitution Amendment Article 89, §8. Until the Charter provisions are altered in an appropriate manner, however, the provisions remain in full force and effect and must be followed.
To be sure, the word “forthwith” has some flexibility and does not require action within seconds or even hours of the time the vacancy occurs. Even in the Board’s view, however, the word means “as soon as practicable.” See Gamwell v. Bagley, 352 Mass. 378, 382 (1925), cited in the Board’s Supplemental Memorandum at 1-2. The word does not mean, and cannot be stretched to mean, “as soon as it becomes clear that *153 other approaches will not work.” Without attempting the almost metaphysical task of determining when the moment of practicability first arrived in this case, it suffices to say that, at this point, that moment lies in the past, not in the future.
B. Injunctive Relief
The foregoing discussion leads inexorably to the question whether a preliminary injunction should issue in the form plaintiffs seek. Here, is not clear that the criteria for preliminary relief have been met. At least on the facts recited above, there can be little doubt about the plaintiffs’ likelihood of success on the merits.
The likelihood of irreparable harm in the absence of an injunction is less clear. The system of law — the legal order as a whole — is warped each time a public body declines for whatever reason to do what the law requires. And at some point, a disinclination to follow a disfavored law or set of laws can undermine the rule of law itself. The record in this case, however, shows neither that that point has been reached nor that it impends.
The harm to the City if an injunction erroneously issued requiring the Board to call an election would be real and palpable. In addition to the harms recited by the City agencies, there is the confusion in the electoral process such an injunction would bring.
The public interest clearly favors neither course. On the one hand, the public interest is served by fidelity to the rule of law and would therefore be served by ordering the Board to do what the law, on this record, seems clearly to require. On the other hand, the Board’s view of the deleterious effect of applying the 120-day requirement to this set of facts is a not unreasonable basis for concluding that the public interest would not be served by issuance of an erroneous preliminary injunction.[2]
Finally, the court should be slow to enter an order before a full hearing on the merits that requires a public body, duly elected and duly charged with responsibility both to the people and to the rule of law, to take some action the body is disinclined to take. Whether or not one is here concerned with separation of powers, considerations of comity suggest that a court should enter a mandatory injunction against a public body on a preliminary basis only when the harm is real, mounting, unalloyed by any public benefit and without remedy save for the injunction itself. At least the last two conditions are not here and now.
The court, however, is required to consider the factors just discussed only in connection with preliminary relief, i.e., relief ordered before entry of a final judgment. Those factors are inapplicable after a hearing on the merits when the court is in a position to enter, and is required to enter, the order, if any, the record requires. Because the facts of the case appear virtually undisputed, a trial on the merits will require little additional preparation. The public interest surely would be served by a prompt trial so that the important electoral process can shape itself to what is going to happen instead of continuing to exist in a state of uncertainty. In the last analysis, therefore, I am persuaded that a prompt trial on the merits and not preliminary relief of the type plaintiffs seek is what this case requires.
III. ORDER
In light of the foregoing, plaintiffs’ motion for a Preliminary Injunction should be, and it hereby is, DENIED. The case is set for a trial on the merits without juiy on May 17, 1994 at 9:00 a.m. in Courtroom 11A. The parties shall file at that time a joint pretrial memorandum conforming to the requirements of Appendix A to Superior Court Standing Order 1-88.

 The papers and the argument of counsel suggested that, at least for purposes of the preliminary injunction, all parties agreed that these facts were undisputed. Because the salient facts concern dates on which votes were taken and the nature of the votes taken, it is not likely that there will be significant factual dispute when the matter comes on for trial.

 I refer to erroneous issuance of a preliminaiy injunction because no harm with which the law is concerned flows from proper issuance of a preliminary injunction. The factors the Court must consider when asked to issue a preliminaiy injunction focus on the risks, and consequences, of error precisely because the court is being asked to act in advance of its final determination of the rights of the parties.